RITTER v MILK & ICE CREAM DRIVERS AND DAIRY EMPLOYEES UNION: LOCAL NO. 336, et

Ohio Appeals, 8th Dist; Cuyahoga Co.

No. 16908. Decided Dec. 23, 1939.

Charles Auerbauch, Ray T. Miller, and Louis Vinocour, all of Cleveland, for plaintiff-appellant.

Baker, Hostetler & Patterson, William J. Corrigan, Thompson, Hine & Flory, Squire, Sanders & Dempsey, Calhoun, McLeod & Fricke. J. G. Ehrlich, H. S. Mendelsohn, J. Paul Thompson, D. R. Sizer and Connors & Clarke, all of Cleveland, for defendants-appellees.

OPINION

By LIEGHLEY, J.

The evidence reduced to writing with all exhibits is before this court. Any attempt to summarize the same would require the number of pages contained in one of the main briefs. There can be little dispute about what the evidence is. Sharp conflict arises over what inference may reasonably and logically be drawn, what fair and reasonable conclusions may be and should be deduced therefrom, and what construction should be placed upon the whole situation as established by the evidence. What was the ultimate object and purpose of all the negotiations, of all the acts, words and deeds said and done or not said and done by each and all of the parties hereto as disclosed by the evidence or reasonably inferred therefrom. The proper answer to this inquiry will solve this problem.

It is the contract of October, 1937, involved herein, executed by the Union as one party, and the Milk Dealers. as the other,—each dealer signing a separate but like contract with the Union. Plaintiffs, brokers, seek an order nullifying this contract, upon the claim that it is the result of a conspiracy between the Union and the Milk Dealers to fix prices, to eliminate competition,

to create a monopoly, and put the plaintiff brokers out of business. To sustain their claim, the plaintiffs depend for the most part upon the minutes of a large number of meetings held over a period of weeks by the committees of the Union and the dealers, which minutes appear to record the remarks, comments, demands and arguments of the members of the Committees. Their differences, whether genuine or otherwise, through the negotiations evidenced by the minutes of these meetings, finally were adjusted in manner and form as expressed by the written contract involved in the litigation.

The brokers are independent operators. They own their own equipment and buy their milk supply already bottled and capped at the platforms of the dealers and then peddle them on their own respective milk routes established by each broker.

The Union demanded, and the contract provides that the Union shall deliver all milk of the dealer signing said contract with the Union. The brokers say this cuts off their supply of milk, and doubtless does close the door of such contracting dealer to all brokers, but does not close the door of any dealer not under contract with the Union, nor any other source of supply than dealers under such contract. But the brokers say that all are under contract and the result is no milk supply obtainable or available to them and they are out of business.

The contract provides for a "closed shop", the handling and delivery of the entire milk supply of a dealer by union members and wages of milk drivers paid upon a commission basis. It is said the Union demanded a closed shop and a standardized weekly or hourly wage. The Dealers insisted upon the commission method of pay. The Union agreed to the latter only upon condition that it handle or deliver the whole supply of the dealer, to eliminate thereby the ever present competition of the Broker receiving his milk from the dealer who at the same time has union drivers on the streets delivering milk

on the dealer's account with routes overlapping those of the brokers.

The Union insisted that if pay shall be by commission, the employer should not create competition for the employee, by delivering milk to the broker with the same labels on the bottles, the same color scheme on the wagon, the driver with like regalia, and thus create an ideal set-up for price cutting at the expense of wages by commission.

But the Brokers say all those alleged attempts to negotiate by the Union and the Dealers amounts to nothing more nor less than a staging or make-believe with a real underlying design and unlawful primary purpose of getting rid of Brokers. While no one qualified or authorized says so, the only reasonable inference from what was said and done, it is claimed, clearly establishes that such was their nefarious design and scheme.

Certain it is, that if the Union and Dealers were jointly intending and conniving to get rid of the Brokers as their chief objective, and these many meetings of their Committees had and held over a period of weeks were merely pretended or secondary considerations to give legal coloring to their prime objective, the performance of this contract should be enjoined.

If, however, there existed at that time real, substantial controversies in the milk industry between the Union and the Dealers, which called for adjustment and settlement to avoid imminent economic strife and threatened strike, and such was the outstanding paramount objective of the contending parties dealing adversarily, then the performance of this contract should not be enjoined, even though the result be that the sources of milk supply from these dealers to these brokers be terminated.

The principle of the closed shop has become a recognized legal status to be attained through negotiations between Employer and Employee. Seldom does a large factory or industry establish a closed shop that there are not some victims strewn along the pathway— victims in the sense that the sphere

and opportunities of employment to the non-union men are restricted or extinguished. Unlawful conspiracy cannot be and should not be inferred from the fact alone that some Brokers are without milk supply as a result of a closed shop contract between the Union and Dealers, negotiated and executed in adjusting their labor relations. Many a former profitable corner grocery and drug store has been annihilated in the evolution and growth of the chain stores. It seems to be the order of the day.

The right of collective bargaining between Employer and Employee is recognized and established at present in our industrial activities with respect to wages, hours and working conditions. It is recognized and encouraged even by high authority.

With the right to insist upon a closed shop contract and the right to bargain as to wages, it is doubtful if anyone would challenge the legality of this contract but for the seeming calamity to the Brokers. Of course, the Brokers may sell their equipment and routes, or they may seek other sources of supply, or join the Union and drive and sell for the Dealers direct. It should be noted that this contract makes no reference to Brokers. Their misfortune is a mere incidental consequence, if the contract be otherwise legal.

A thoughtful consideration of all the facts and circumstances of this case compels the inescapable conclusion that the plaintiffs have not sustained their burden of proof. The inference and conclusions drawn have the element of plausability but fall short of establishing the probability of their claims.

On the other hand, the claims of the defendants that this contract expresses the terms of settlement of a genuine labor dispute, adversarily negotiated and concluded, seem to be supported by the greater weight of the evidence.

It is our opinion and judgment that real disputes existed when the Union, in August, notified the Dealers that their contract would not be renewed. There was disatisfaction with the wage schedule, calling for readjustment in the minds of the employees. When the employers stood firmly for wages on commissions, the demand that the Union deliver all the milk of the Dealer in order to protect his wage, became a proper factor or item for collective bargaining. This contract was the result of the contentions and demands of opposing forces. The primary objective was the solution of economic differences between the Dealers and the Union to avoid a calamitous strike in the milk industry, and all the hardships and suffering that would ensue.

It was said that many dealers do not want this contract, which, if true, is not controlling. They signed the contract. Doubtless some members of the Union would prefer another form of contract. In collective bargaining, the majority rules.

It was said that some of the larger Dealers do not sell to Brokers, but that they keenly desire the Brokers eliminated in order to get the sale of thirty thousand (30,000) quarts of milk per day now disposed of by Brokers. Of course, there is little substance to this argument for the obvious reason that the present purchasers from the Brokers will decide from whom they will buy when the Brokers abandon their routes, whether from the larger or smaller dealers.

It is our conclusion that Section XXV of the contract is not a price-fixing but purely a wage-fixing provision. It is an attempt to standardize the wages at a uniform rate for the drivers, dependent to some extent upon the energy and industry of the individual driver. The dealer may sell his product for whatever price he chooses without any restriction or limitation imposed by this Section, but the wages are calculated upon a uniform and fixed basis.

The Brokers insist there was a conspiracy between the Union and the Dealers with the unlawful purpose and plan to get rid of brokers. If it was the wish of the majority of the Dealers, motivated by a conviction that it would be for the best interests of their

634

business, it would seem feasable to accomplish this end by agreement among themselves not to sell to them, without joining in an unlawful combination with the Union. If the desire originated with the Union and by it insisted upon, as it did, then the matter was a lawful subject for inclusion in the list of subjects for collective bargaining to the extent that the activities of the Brokers rendered insecure and uncertain the amount of their pay by Commission.

In short, and finally, the misfortunes of the Brokers are but the incidental result of the terms of a contract between the Dealers and the Union, entered into in settlement of a labor controversy by bargaining at arm's length and the consequences to these brokers are not unlike those experienced among others under similar circumstances in other labor disputes.

The conclusion is that injunctive relief should be denied, and the petition dismissed at costs of the plaintiffs.

Exceptions may be noted.

TERRELL, PJ. & MORGAN, J., concur.